**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANICA ASHBOURNE,<br><br>Plaintiff,<br><br>v.<br><br>DONNA HANSBERRY, *et al.*<br><br>Defendants. | Civil Action No. 12-cv-01153 (BAH)<br><br>FILED TEMPORARILY UNDER SEAL<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

The plaintiff, Anica Ashbourne, who is a tax attorney and proceeding in this action *pro se*, initiated this lawsuit against her former employer, the U.S. Department of Treasury ("Agency"), and three of her former supervisors, in their individual and official capacities, claiming four violations of the Privacy Act, 5 U.S.C. § 552(a), *et seq*. *See generally* Consolidated Amended Complaint ("Consol. Compl.") First–Fourth Causes of Action, ECF No. 49.[1] She seeks "injunctive, declaratory, and monetary relief," *id.* ¶ 1, including, *inter alia*, "[e]xpedit[ing] this action in every way;" "[d]eclar[ing] that [the individual defendants] had violated the Privacy Act;" referring the individual defendants for "criminal prosecution" and to various State professional licensing authorities for "intentional misconduct;" ordering the Agency "to locate qualified individuals who can properly adjudicate Plaintiff," "schedule a

[1] The plaintiff originally filed, in the United States District Court for the District of Maryland, three separate actions, which were consolidated and transferred to this Court. Order Granting Consolidation, dated January 19, 2012, ECF No. 9; Mem. Op. and Order on Transfer, dated July 12, 2012, ECF Nos. 21 & 22. The plaintiff was then directed to file "a single, consolidated complaint containing all claims remaining," Order Denying Defendants' Motion to Dismiss, dated August 9, 2013, ECF No. 44, which consolidated complaint was filed on October 29, 2013, Consol. Compl., ECF No. 49, and is the operative complaint in this matter. The Fifth Cause of Action, under 42 U.S.C. § 1983, Consol. Compl. ¶¶ 64–74, was dismissed, along with all claims against the individual defendants in their individual capacities, *see* Order Granting, In Part, Defs.' Motion to Dismiss, dated September 3, 2014, ECF No. 58.

name-clearing hearing," and "expunge Plaintiff's records of inaccurate, relevant, timely, and incomplete information;" and, finally, "[a]ward[ing] Plaintiff the maximum of compensatory and equitable relief," *id.* at 10 (Request for Relief).[2] After five months of discovery, the parties filed cross-motions for summary judgment, which are now pending before the Court. *See* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 63; Pl.'s Mot. Summ. J. ("Pl.'s Mot."), ECF No. 64. For the reasons set forth below, the defendant's motion is granted and the plaintiff's motion is denied.

## I. BACKGROUND

The parties submitted a total of over seven hundred pages of sometimes repetitive evidence as part of the record on summary judgment. Review of the material submitted by the plaintiff has posed particular challenges since certain of her exhibits appear to be excerpts from other documents, without a clear demarcation of where one document ends and another begins. The Court briefly summarizes the relevant facts below.

The plaintiff, a tax attorney and Certified Public Accountant, began working for the Department of Treasury in its Global High Wealth group ("GHW") within the Internal Revenue Service as a probationary employee on June 21, 2010. Def.'s Statement of Material Undisputed Facts ("Def.'s SMF") ¶ 1, ECF No. 63-1; Def.'s Mot. Ex. A ("Notification of Personnel Action, dated June 23, 2010") at 13, ECF No. 63-2. During the plaintiff's probationary employment

---

[2] The Agency correctly points out that many of the "remedies requested by Plaintiff are not available under the Privacy Act," Def.'s Mem. at 24, which limits relief to "the correction of any inaccurate or otherwise improper material in the record," "right of access" to records denied to the plaintiff and, under certain conditions, a minimum monetary award, *Doe v. Chao*, 540 U.S. 614, 618, 627 (2004); 5 U.S.C. § 552a(g)(2)–(4). Although the plaintiff seeks to "expunge" certain records, she must first petition the agency to amend her records. *See Hunt v. U.S. Dep't of Veterans Affairs*, 739 F.3d 706, 707 (D.C. Cir. 2014) (per curiam) ("Appellant does not allege that he asked the VA to amend any of his records, so he has failed to state a claim for a violation of the Privacy Act's amendment provision."). The record contains no evidence, nor has the plaintiff made any effort to demonstrate, that she petitioned the Agency administratively for such amendment; rather, all the administrative steps she took were direct challenges to her termination. *See generally* Pl.'s Opp'n Ex. FF ("Treasury Dep't Final Agency Decision, dated December 12, 2012") at 11–13 (summarizing the procedural history of the plaintiff's administrative actions), ECF No. 89-4. Thus, even if the plaintiff were to prevail on her Privacy Act claims, her various requests for equitable relief could not, as a matter of law, be awarded.

with GHW, the federal government conducted a background investigation into the plaintiff's prior employment history. Def.'s SMF ¶¶ 5–8. In support of this investigation, the plaintiff, was required to complete an Electronic Questionnaire for Investigations Processing ("E-QIP"), listing every place of her employment in the last ten years, including the reasons for termination, as well as any periods of unemployment. *See generally* Def.'s Mot. B ("Pl.'s E-QIP"), ECF No. 63-3. The government, as part of the investigation, interviewed the plaintiff and a number of her former employers to verify the reasons for her termination, if any, and to determine whether the plaintiff had any "previous employment issues." *See* Def.'s Mot. Ex. B ("Interview Notes for Pl.'s Background Check") at 104, 105, ECF No. 63-3.

The background investigation of the plaintiff revealed two discrepancies: First, the plaintiff indicated on her résumé, under "Work Experience," that she worked as a "Senior Tax Manager/Senior Tax Analyst" at a firm called "Ashbourne & Company" for over five years, from January 2002 to May 2007, Def.'s Mot. Ex. A ("Pl.'s Application") at 22, ECF No. 63-2. The investigation found that during this time period, however, the plaintiff was self-employed, Interview Notes for Pl.'s Background Check at 113, held various temporary and full-time positions and, in between temporary jobs, received unemployment benefits, Pl.'s E-QIP at 46–57. Second, the plaintiff claimed that she resigned one position as a result of restrictive working conditions imposed by the employer and his wife, *id.* at 59, but the investigation revealed a discrepancy between this stated reason and the reasons described by this former employer in a signed affidavit. The former employer stated in the affidavit that the plaintiff had been terminated for failure to follow instructions and for missing a project deadline due to an unexcused absence of three days. Def.'s Mot. B ("Former Employer Aff.") at 125, ECF No. 63-3.

On May 10, 2011, before the end of the plaintiff's probationary period, but after almost eleven months of satisfactory work, Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") Ex. S ("Pl.'s Employee File") at 57, ECF No. 89-3, the Agency sent the plaintiff a notice of proposed termination because the plaintiff provided misleading information leading to the two discrepancies uncovered in the background investigation. Def.'s Mot. Ex. D ("Proposed Termination Letter, dated May 10, 2011") at 2, ECF No. 63-5. The plaintiff was given an opportunity to "respond . . . in writing and to furnish affidavits and evidence in support." *Id.*

On May 19, 2011, the plaintiff submitted a written response to the proposed termination letter, addressing the two discrepancies. Def.'s Mot. Ex. D ("Pl.'s Resp. to Proposed Termination, dated May 19, 2011") at 4–8, ECF No. 63-5. The plaintiff explained, first, that Ashbourne & Company was her sole proprietorship, which "automatically" came into legal existence when she marketed the company and "received W-2s for temporary work." *Id.* at 5. Second, the plaintiff challenged the veracity of her former employer's affidavit, alleging that she received "an extra bonus check" three weeks after she left the firm and that she "do[es] not believe that these additional payments represent rewards for an employee who was terminated for poor work performance." *Id.* at 8. She further alleged that this former employer was engaging in "unauthorized practice of law," as "an unlicensed attorney . . . preparing wills and trust documents," and cited this allegation as an additional reason for her resignation from that position. *Id.* at 7.

On May 26, 2011, the Agency notified the plaintiff that, after considering her written response, the Agency's initial determination that the plaintiff provided misleading information remained unchanged, and that her termination would become effective on May 28, 2011. Def.'s Mot. D ("Termination Letter, dated May 26, 2011") at 23, ECF No. 63-5. At the same time, the

Agency apprised the plaintiff of her right to appeal the termination either to the Merit Systems Protection Board or to the Internal Revenue Service's discrimination complaint system, depending on whether she alleges "this action was based in whole or in part on [her] marital status or political affiliation, or that improper procedures were used to process this action" or was based "on discrimination because of race, color, religion, sex, age, national origin, or physical or mental disability." *Id.* at 23–24.

The plaintiff challenged her termination through multiple channels, both administratively and in federal court. Specifically, on June 8, 2011, the plaintiff contacted an Equal Employment Opportunity ("EEO") Counselor. Pl.'s Opp'n Ex. FF ("Treasury Dep't Final Agency Decision, dated December 12, 2012") at 16, ECF No. 89-4.[3] On the same date, she also filed an appeal with the Merit Systems Protection Board, which dismissed the appeal for lack of jurisdiction. *Id.* at 11.[4] On November 9, 2011, the plaintiff filed a complaint with the Treasury Complaint Center alleging "harassment and/or disparate treatment due to her race and/or sex." *Id.* at 12. On December 12, 2012, the Treasury Complaint center issued a final agency decision, finding no evidence of discrimination, harassment or hostile work environment. *Id.* at 23.

As noted, *supra* n.1, in September and November, 2011, the plaintiff filed three separate lawsuits in the United States District Court for the District of Maryland, which claims were ultimately consolidated in the single, Consolidated Amended Complaint, ECF No. 49. The

---

[3] The plaintiff alleges that she contacted an EEO counselor on June 8, 2011, but the Agency has no record of any such contact. Treasury Dept's Final Agency Decision, dated December 12, 2012, at 16. Instead, Agency records indicate that the plaintiff's first request for EEO counseling occurred on September 29, 2011. *Id.* Nevertheless, the Agency treats June 8, 2011 as the initial EEO contact date. *Id.*

[4] The Merit Systems Protection Board dismissed the plaintiff's appeal of her termination because, as a probationary employee, "she could appeal her termination to the Board if it was based on partisan political reasons or marital status." Pl.'s Opp'n Ex. D ("Merits Systems Protection Board Decision, dated July 5, 2011") at 35, ECF No. 89-1. The plaintiff, however, did not allege "that her termination was based on her marital status or partisan political affiliation." *Id.* The plaintiff then filed a Petition for Review of the dismissal of her appeal but withdrew the petition on September 30, 2011. Treasury Dept' Final Agency Decision, dated December 12, 2012 at 11.

plaintiff alleges that the Agency violated two sections of the Privacy Act, 5 U.S.C. §§ 552a(g)(1)(C) and (g)(1)(D), Consol. Compl. ¶ 1, in the following three ways: (1) failing to maintain accurate, relevant, timely and complete records, *id.*, First and Second Causes of Action; (2) violating the fairness standard by allowing a supervisor "to opine" that GHW "had believed" her former employer's "account, and not Plaintiff," *id.*, Third Cause of Act; and (3) making improper disclosures to unauthorized employees and failing to redact her social security number and date of birth from documents, *id.* Fourth Cause of Action.

The parties' cross-motions for summary judgment on the plaintiff's Privacy Act claims are now ripe for resolution.[5] *See generally* Def.'s Mot.; Pl.'s Mot.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific

[5] While the claims against the individual defendants in their private capacity were previously dismissed for lack of proper service, see Order Granting, in Part, Defs.' Mot. to Dismiss, dated September 3, 2014, at 2, ECF No. 58, the Privacy Act claims against them in their official capacity remained pending. Although the individual defendants did not move for summary judgment, they are nonetheless entitled to dismissal since the Privacy Act does not permit civil actions against individual agency employees. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 533 n.4 (D.C. Cir. 2015) ("The district court properly dismissed [Privacy Act] claims [against private corporations and Department of Homeland Security officials] *sua sponte*, as the Privacy Act creates a cause of action against only federal government agencies and not . . . individual officials." (internal citations omitted)). Accordingly, the Court, *sua sponte*, dismisses the remaining Privacy Act claims against the individual defendants sued in their official capacities.

facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party" (internal quotations and citation omitted)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," is "as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment.'" *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

In cases, such as this one, involving cross-motions for summary judgment, "each side concedes that no material facts are at issue only for the purposes of its own motions." *Sherwood v. Washington Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (citation omitted). In other words, "[t]he fact that both parties simultaneously are arguing that there is no genuine issue of fact . . . does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." CHARLES A. WRIGHT AND ARTHUR R. MILLER, *ET AL.* 10A FED. PRAC. & PROC. CIV. § 2720 (3d Ed. 2014); *see CEI Wash. Bureau, Inc. v. U.S. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (noting that cross-motions for summary judgment and absence of argument about existence of material facts "does not concede the factual assertions of the opposing motion"); *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (holding "summary judgment was not necessarily appropriate solely because the parties filed cross-motions for summary judgment"). "Cross-motions for summary judgment are treated separately," *Shea v. Kerry*, 961 F. Supp. 2d 17, 27 (D.D.C. 2013) (citing *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982)), such that "the court must review each motion . . . on its own merits 'to determine whether either of the parties deserves judgment as a matter of law,'" *Rossignol v. Voorhaar*, 216 F.3d 516, 523 (4th Cir. 2003) (quoting *Phillip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)); *see Waterkeeper Alliance v. U.S. Coast Guard*, No. 13-289, 2014 WL 5351410, at *7 (D.D.C. Sept. 29, 2014) (same); *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (same).

## III. DISCUSSION

After accepting "a number of temporary consulting assignments," Consol. Compl. ¶ 13, the plaintiff "was optimistic that the Agency would eventually offer her a supervisory position with a salary in excess of $110,000," *id*. ¶ 16, and this aspiration came true. "On May 21, 2010, Plaintiff had accepted [GHW]'s $115,742 offer to work as an Auditor-in-Charge." *Id*. ¶ 18. This job was short-lived, however, because "[o]n May 28, 2011, [GHW] terminated Plaintiff's employment," *id*. ¶ 25, based on determinations made after conducting a background investigation of the plaintiff. The plaintiff faults the background investigation for being conducted by employees, who "were illiterate," *id*. ¶ 46, "not knowledgeable," *id*. ¶ 33, and lacked relevant experience, *id*. ¶ 47–48, to evaluate her prior work experience, and who "failed to collect and record Plaintiff's explanations," *id*. ¶¶ 33, 45, rendering the Agency's reliance on this background investigation to make its termination decision "unreasonable," *id*. ¶¶ 46–50.

The plaintiff's allegations of Privacy Act violations are plainly intertwined with her palpable disappointment in the Agency's decision to terminate her employment. The Privacy Act, however, is "'not intended to shield [federal] employees from the vicissitudes of federal personnel management decisions.'" *Hubbard v. U.S. EPA, Adm'r, et al.*, 809 F.2d 1, 5 (D.C. Cir. 1986) (quoting *Albright v. United States*, 732 F.2d 181, 190 (D.C. Cir. 1984)) (alteration in the original); *see also Kleiman, v. Dep't of Energy*, 956 F.2d 335, 338 (D.C. Cir. 1992) ("This court has refused to allow . . ., under the aegis of the Privacy Act or otherwise, district court review of personnel decisions judicially unreviewable under the C[ivil] S[ervice] R[eform] A[ct]." (citations omitted)). The Act is principally concerned with "factual or historical errors," rather than "*judgements* of federal officials." *Kleiman*, 956 F.2d at 337–38 (quoting *Rogers v. U.S. Dep't of Labor*, 607 F. Supp. 697, 699 (N.D. Cal. 1985)) (emphasis in the original). Mindful of

this significant limitation on the reach of the Privacy Act, the Court now turns to an overview of the statutory requirements for a claim under this law, before turning to analysis of the specific Privacy Act violations that the plaintiff alleges occurred. [6]

## A. THE PRIVACY ACT

The Supreme Court has succinctly described the Privacy Act as "a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 132 S. Ct. 1441, 1446 (2012). This Act also provides remedies, including "the correction of any inaccurate or otherwise improper material in the record," and the "right of access" to records denied to the plaintiff. *Doe v. Chao*, 540 U.S. 618, 627 (2004). In addition, as pertinent here, when "an agency fails to comply with those requirements 'in such a way as to have an adverse effect on an individual,' the Act authorizes the individual to bring a civil action against the agency," and "[f]or violations found to be

[6] In her cross-motion, the plaintiff, inexplicably, seeks summary judgment on her § 1983 claim, which is set out in her Fifth Cause of Action, even though this claim has already been dismissed. Order Granting, in Part, Defs.' Motion to Dismiss, dated September 3, 2014, at 1, ECF No. 58. Specifically, the plaintiff claims that the agency violated her "Fifth Amendment Liberty Interest," Pl.'s Mot. at 1, in her reputation when the agency "terminated Plaintiff amidst stigmatizing charges of dishonesty without due process," Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 10 (citing Consol. Compl., at "pages 15–18," which do not exist). Again, this claim has no merit. While the D.C. Circuit has found that "due process requires only that [the plaintiff] have 'an opportunity to clear his name,'" *McCormick v. District of Columbia*, 752 F.3d 980, 989 (D.C. Cir. 2014) (quoting *Codd v. Velger*, 429 U.S. 624, 627 (1977)), this procedural requirement is met when the "'claimant ha[d] notice of the charges which have been raised against him, and an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury,'" *McCormick*, 752 F.3d at 990 (quoting *Campbell v. Pierce Cnty., Ga.*, 741 F.2d 1342, 1345 (11th Cir. 1984)); *see also Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 172 (2010) (finding the plaintiff received the requisite due process when he was provided with a Proposed Notice of Termination, notifying the plaintiff of the reasons for his termination, and given an opportunity to submit a written answer and to furnish any affidavits or other evidence; the court notes that "what he did not receive was the outcome that he desires, which unfortunately for him is not guaranteed by the Fifth Amendment"). Here, the plaintiff concedes not only that she received a Notice of Proposed Termination, but also that she had an opportunity to submit a written response and supporting evidence and, in fact, did submit a five-page response, with attached exhibits. *See* Proposed Termination Letter, dated May 10, 2011 at 32; Pl.'s Resp. to Proposed Termination, dated May 19, 2011 at 34–52. To the extent that the plaintiff bickers about whether the Agency reviewed her submissions before issuing its final termination decision, the record reflects that her evidence was considered. *See* Termination Letter, dated May 26, 2011 (stating "I have considered all 10 of the items that you've provided in your written response . . . . I have considered all 7 of the items you've provided in your written response . . . ."). Thus, even if the plaintiff had adequately pleaded her Fifth Amendment claim, the Agency would be entitled to summary judgment since she was afforded all the due process required.

'intentional or willful,' the United States is liable for 'actual damages.'" *Cooper*, 132 S. Ct. at 1446 (quoting 5 U.S.C. §§552a(g)(1)(D) and 552a(g)(4)(A)).

Thus, the Act describes four avenues for individuals to seek civil remedies for any violations. *Doe*, 540 U.S. at 618. "The first two categories cover deficient management of records: subsection (g)(1)(A) provides for the correction of any inaccurate or otherwise improper material in a record, and subsection (g)(1)(B) provides a right of access against any agency refusing to allow an individual to inspect a record kept on him." *Id.* "The two remaining categories deal with derelictions having consequences beyond the statutory violations *per se*." *Id.* at 619. "Subsection (g)(1)(C) describes an agency's failure to maintain an adequate record on an individual, when the result is a determination 'adverse' to that person." *Id.* "Subsection (g)(1)D) speaks of a violation when someone suffers an 'adverse effect' from any other failure to hew to the terms of the Act." *Id.* Suits under subsections (g)(1)(C) and (D) require a showing that the "agency acted in a manner which was intentional or willful" and that the plaintiff sustained "actual damages." *Id.* (citing 5 U.S.C. § 552a(g)(4)(A)).

As discussed in more detail next, after five months of discovery, the plaintiff has failed to adduce sufficient evidence of any genuine issue of material fact that would even tend to show she could satisfy the requisite elements under either subsection (g)(1)(C) or (g)(1)(D), while the Agency has demonstrated its entitlement to summary judgment.

### B. The Plaintiff Cannot Satisfy the Elements of Subsection (g)(1)(C) As a Matter of Law

In order to recover damages under § 522a(g)(1)(C), the plaintiff must "establish four elements: (1) [she] has been aggrieved by an adverse determination; (2) the [agency] failed to maintain [her] records with the degree of accuracy necessary to assure fairness in the determination; (3) the [agency's] reliance on the inaccurate records was the proximate cause of

the adverse determination; and (4) the [agency] acted intentionally or willfully in failing to maintain accurate records." *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1007 (D.C. Cir. 2009) (quoting *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996).

With this legal framework in mind, the Court turns to the plaintiff's § (g)(1)(C) claims that the Agency failed to "maintain accurate, relevant, timely and complete records" by (1) relying on unqualified employees to maintain the plaintiff's records, Consol. Compl. First Cause of Action; (2) maintaining incomplete records, *id.* Second Cause of Action; and (3) documenting the opinion by an Agency official that credited the reasons given for the plaintiff's termination from a job almost a decade earlier, in 2001, relayed by the plaintiff's former employer in a signed affidavit, over the plaintiff's own account, *id.* Third Cause of Action.

The parties do not dispute that the plaintiff "has been aggrieved by an adverse determination," namely, her termination from the Agency and that she, consequently, meets the first element under § (g)(1)(C).[7] Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 7, ECF No. 63. The parties vigorously contest whether the Agency maintained inaccurate or incomplete records and whether any reliance on such flawed records was the proximate cause of her termination. *Id.* at 8. The Agency terminated the plaintiff after determining that she "provided misleading information during the pre-employment process regarding the use of Ashbourne & Company" and regarding the circumstances surrounding her departure in 2001 from a former

[7] The plaintiff also alleges, as part of her dismissed Fifth Cause of Action, Consol. Compl. Fifth Cause of Action, *see supra* n.6, that the plaintiff's records have been disclosed to "other federal employees, government agencies, and to outside third parties," such that it "grossly impaired Plaintiff's ability to pursue employment opportunities within her chosen professions," and, in particular, because the "Plaintiff has applied for other federal positions[] . . . there is a strong likelihood that plaintiff's personnel file, with the stigmatizing allegations included, has already been inspected by other agencies." Consol. Compl. ¶¶ 72, 73. The plaintiff, however, presented no evidence that she faced adverse employment decisions from any other federal agency. Therefore, the plaintiff's adverse employment action is limited to her termination from GHW. *See Chambers*, 568 F.3d at 1007 (finding that the "adverse effect" of "hamper[ing]" the plaintiff's "ability to apply for jobs in the federal government" is "not enough to make out a claim under subsection (g)(1)(C), which requires a specific 'adverse determination' resulting from an agency's failure to maintain accurate records").

employer. Proposed Termination Letter, dated May 10, 2011 at 2; Termination Letter, dated May 26, 2011 at 23. Thus, the focus of the plaintiff's Privacy Act claims are the specific records underlying the Agency's termination determination. The Court now turns to consideration of the parties' arguments pertaining to these records.[8]

### 1. The Agency Did Not Rely on Inaccurate Records to Determine the Plaintiff Provided Misleading Information Regarding the Use of Ashbourne & Company

The defendant contends, and the Court agrees, that the plaintiff has not presented evidence of a single inaccurate record relied upon by the Agency to determine that the plaintiff "provided misleading information during the pre-employment process regarding the use of Ashbourne & Company," Termination Letter, dated May 26, 2011 at 23, and, consequently, fails to satisfy the second and third elements required for a viable claim under § (g)(1)(C). Def.'s Mem. at 12. The plaintiff does not dispute that, on the résumé she submitted to the agency prior to her employment, she listed herself as a "Senior Tax Manager/Senior Tax Analyst" at a firm called "Ashbourne & Company," for the entire period between January 2002 and May 2007.

---

[8] The plaintiff alleges a litany of issues relating to how her background investigation was performed and "over 87 material, factual errors" in her personnel records. Consol. Compl. ¶ 44. All of these issues are immaterial unless the allegedly inaccurate or incomplete information in her personnel record touches upon the two bases enumerated by the Agency for her termination; otherwise, that particular information or record was not the "proximate cause" of the adverse determination. In any event, the plaintiff never details the "87 material, factual errors" she alleges, and some of her specific descriptions of inaccurate information in her records amount to only typographical errors or a blatant misreading of the record. For example, the plaintiff alleges that her record reflected terminations "from places where Plaintiff had never worked, or from jobs where the employer said otherwise," such as "TIGTA," Pl.'s Opp'n at 4, which refers to the agency's mistaken abbreviation to "TIGTA" for the "Department of the Treasury Office of Inspector General," from which the plaintiff was terminated in January 27, 2010. Pl.'s Opp'n Ex. F ("Pl. Letter to Assistant Inspector General, dated Feb. 8, 2010") at 88, ECF No. 89-1. The plaintiff also alleges that the defendants maintained records that falsely compared the plaintiff to "alcoholics and criminals" when she had no such characteristics in her background. Pl.'s Opp'n at 3, ECF No. 89. The Agency did not attribute these characteristics to the plaintiff, as she implies, however, but only, after uncovering discrepancies in the plaintiff's background, generated a "Comparisons Listing" for purposes of evaluating comparative consequences. *See* Pl.'s Opp'n Ex. A ("Comparison Listings"). The plaintiff also claims that GHW "deleted records that were part of Plaintiff's E-QIP application," Pl.'s Opp'n at 3, but this allegation appears to refer to a single letter from a former employer, who explained that the plaintiff was laid off in 2009, due to budget cuts rather than due to any negative circumstances, *see* Pl.'s Opp'n Ex. K (Letter from County of Stafford, dated April 29, 2009) at 101, ECF No. 89-2. Yet, nothing about the plaintiff's employment with this former employer in 2009 had any bearing on the Agency's termination decision and, thus, this letter, even if "deleted," is immaterial.

Pl.'s Application at 22; Pl.'s Statement of Undisputed Material Facts ("SMF") ¶ 11, ECF No. 64. The plaintiff admits that during this period, instead of working steadily for a single employer, she worked in multiple temporary and full time positions during the period, and collected unemployment benefits in between jobs.[9] Pl.'s Opp'n at 8; Pl.'s E-QIP at 46–57.

The plaintiff's papers make clear her disagreement is with the Agency's interpretation of documents she herself submitted during the employment process, rather than its reliance on any *factual* errors. The plaintiff complains of the Agency's reliance on unqualified employees to maintain her records, Consol. Compl. ¶¶ 46–50, the Agency's ignorance about self-employment and sole-proprietorships, Pl.'s Opp'n at 5–6, and the Agency's failure to "verify" its understanding of sole-proprietorships and Ashbourne & Company with the Treasury Department's "Small Business/Self-Employment Division," Pl.'s Mem. at 7–8. None of these arguments present any factual inaccuracies, however; instead, they seek only to undermine the legitimacy of the Agency's judgment that the plaintiff's use of Ashbourne & Company on her résumé gave a misleading impression of steady and continuous work when, in reality, the plaintiff worked at a number of different places and only for months at a time.

As noted, the Privacy Act does not provide an avenue for the plaintiff to challenge the agency's personnel decisions based on the "*judgments* of federal officials" rather than "factual or historical errors." *Kleiman*, 956 F.2d at 337–38 (quoting *Rogers*, 697 F. Supp. at 699) (emphasis in the original); *Hubbard*, 809 F.2d at 5 (noting that Privacy Act limits damages "for an adverse personnel action *actually caused* by an inaccurate or incomplete record" (emphasis in the original)); *Feldman v. C.I.A.*, 797 F. Supp. 2d 29, 47 (D.D.C. 2011) (dismissing the plaintiff's §

[9] The plaintiff in fact marked on her E-QIP two periods of self-employment, from January 2006 to March 2006, and again from April 2007 to June 2007, Pl.'s E-QIP at 44, 47, demonstrating that she knew how to designate certain positions as "self-employment," but failed to do so for the vast majority of the 2002 to 2007 period, during which she was described herself in her résumé as employed at Ashbourne & Company.

(g)(1)(C) claim where he identified only "disagreements with the [report of investigation's] interpretation of legal issues" and no "discrete factual inaccuracies"); *Gard v. U.S. Dep't of Educ.*, 789 F. Supp. 2d 96, 107–08 (D.D.C. 2011) (entering summary judgment for the defendants on Privacy Act claim where the plaintiff "truly disputes not the content of the records reviewed by the agency," but the judgment of DOE officials who concluded, based on those records, that his behavior warranted "temporary removal from the office as a safety precaution"). Here, the Agency made a judgment that the manner in which the plaintiff described her employment on her résumé for a lengthy five year period was materially misleading about the actual nature of her job: instead of a steady, full-time job, she worked at a series of temporary consultancies and full-time positions, interspersed with periods of unemployment.

In sum, with respect to the plaintiff's challenge to the Agency's termination decision, alleging that it was based on incomplete or erroneous records, the only document in the plaintiff's personnel record that can be considered "incomplete or erroneous" is her résumé, which she herself submitted and only belatedly supplemented with more accurate information in the E-QIP, after she had already been offered the position.

### 2. The Agency Did Not Rely on Inaccurate Records to Determine the Plaintiff Provided Misleading Information Regarding Her Departure from a Former Employer

The plaintiff has also failed to demonstrate that the Agency unfairly relied on inaccurate records to determine that the plaintiff provided "misleading information" regarding the plaintiff's departure in December 2001 from a former place of employment. The plaintiff disclosed on her E-QIP that she "immediately resigned from this position" upon meeting with her former employer and his wife, who discussed with her certain work restrictions, such as "assigned bathroom break times," and that as she uttered the words "I resign," her former employer

terminated her at the same time. Pl.'s E-QIP at 69-70; Pl.'s Resp. to Proposed Termination Letter, dated May 19, 2011 at 7 ("I was abundantly clear on [the E-QIP] and in my interviews with the investigators that although I viewed my departure there as a resignation, the firm would view it as a termination."). The plaintiff does not dispute that her former employer submitted a signed affidavit stating that she was terminated for failure to "follow specific instructions on how to perform assignments," and for an "unauthorized absence" of at least three days prior to the completion of a project that resulted in "failure to meet the required deadline" and loss of the client to the firm. Former Employer Aff. at 124–25. Moreover, she does not dispute that, on her E-QIP describing the reasons for her resignation/termination from this position, she omitted the former employer's stated reasons for terminating her.

Instead, the plaintiff argues that she can establish the second element under § (g)(1)(C) that the Agency "failed to maintain [her] records with the degree of accuracy necessary to assure fairness in the determination," *Chambers*, 568 F.3d at 1007, in two ways: First, the Agency failed its obligation to "verify" whether her former employer "had retaliated against Plaintiff as a result of Plaintiff's work as the city's Assistant City Auditor," and "whether Plaintiff could have been AWOL" prior to her last day on the job, Pl.'s Opp'n at 9; Pl.'s Mem. at 7 (citing *McCready v. Nicholson*, 465 F.3d 1, 19 (D.C. Cir. 2006)); and, second, the Agency "violated the accuracy standard when [it] recorded in Plaintiff's files that Plaintiff had lied because [her former employer] told the truth," Pl.'s Mem. at 6 (citing *Doe v. United States*, 821 F.2d 694 (1987)); Pl.'s Opp'n at 10. These arguments are unavailing.

First, as to the plaintiff's contention regarding the Agency's obligation to investigate and verify the former employer's reasons for terminating her, the Agency counters that any duty on its part to take "reasonable steps" to verify the information provided by the former employer was

fulfilled. Def.'s Mem. at 9. While the plaintiff's assertion of retaliation by her former employer would be difficult, if not impossible to verify, the former employer's description of the plaintiff's unexcused absence is different. The D.C. Circuit, in *McCready*, held that "'[a]s long as the information contained in an agency's files is capable of being verified, then, under subsection[] . . . (g)(1)(C) of the Act, the agency must take reasonable steps to maintain the accuracy of the information to ensure fairness to the individual.'" 465 F.3d at 19 (quoting *Sellers v. Bureau of Prisons*, 959 F.2d 307, 312 (D.C. Cir. 1992)) (alterations in the original). In *McCready*, the plaintiff challenged the accuracy of a memorandum prepared by the Inspector General of Veterans Affairs, in particular whether the plaintiff was at work on May 4, 1999. *Id.* The Inspector General had concluded that because the plaintiff "made calls from her 'government issued cell phone' to the Office," the plaintiff was not at work that day, even though the plaintiff claims that she had informed the Inspector General that "she was attending a Senate Finance Committee hearing that day, along with other high-level staff from the VA and several witnesses." *Id.* The Court found that whether McCready was present at a meeting is "a 'fact' capable of verification," and "in light of McCready having brought her attendance at the committee meeting to the Inspector General's attention," the agency should have "contact[ed] these witnesses, or otherwise tak[e] other 'reasonable steps' to verify the Inspector General's assertion about May 4[.]" *Id.*

In the instant case, the Agency did seek the plaintiff's input when it provided her an opportunity to respond to the notice of proposed termination listing the reasons for her termination. Proposed Termination Letter, at 2; Def.'s Mem. at 9. Unlike the plaintiff in *McCready*, however, the plaintiff did not bring to the Agency's attention that, contrary to the former employer's affidavit, she may not have been absent prior to her termination, despite

submitting a five-page single-spaced response and nine exhibits.[10] *See generally* Pl.'s Resp. to Proposed Termination, dated May 19, 2011 at 4–22. Therefore, the Court finds that the Agency fulfilled its duty to verify the accuracy of the signed affidavit.[11]

---

[10] The plaintiff's written response, instead of addressing the single factual error she points to now, provided an alternate explanation for her resignation—she discovered that her former employer was engaging in the "unauthorized practice of law" as "an unlicensed attorney [] draft[ing] wills and trust documents"—and disputed her former employer's claim that she was terminated for "poor work behavior" by submitting bank records purporting to show that her former employer paid her a $300 bonus check on her last day and another "extra bonus check" three weeks after her departure as compensation for "outstanding performance while conceding that [her former employer's wife] exhibited too much animosity for [her] to complete the tax season there." Pl.'s Resp. to Proposed Termination, dated May 19, 2011 at 7–8.

[11] Furthermore, the plaintiff's own evidence, some which she has only submitted in this action and was not before the Agency, actually strongly supports the former employer's version of events, as outlined in his affidavit, that the plaintiff took at least three days off from work to go to Ohio *prior* to her termination. In the plaintiff's alternative version, her trip to Ohio occurred *after* her termination, which she claims occurred on December 17, 2001, and could not have been prompted by her unexcused absence. Pl.'s Opp'n at 9. The plaintiff submitted debit card transaction records showing that she was in Columbus, Ohio from December 18, 2001 through December 21, 2001, confirming that she did, in fact, take a short trip to Ohio in December 2001, consistent with the affidavit. Pl.'s Opp'n Ex. M ("Pl.'s 2001 Bank Statements") at 9, ECF No. 89-3; Pl.'s Opp'n at 10. The plaintiff supports her assertion that she was terminated on December 17, 2001, by submitting interview notes of the former employer prepared a third-party investigator hired by a person using the name "Mitzi Baker." Pl.'s Opp'n Ex. W at 88. These interview notes reflect the former employer simply confirming the plaintiff's specific dates of employment from over a decade earlier that were suggested to him by the investigator. *Id.* In that same interview, the former employer was clear that the plaintiff worked for "ten weeks to be exact," *id.*, which statements have been corroborated by the plaintiff's own exhibits in the form of her paychecks. To the extent the plaintiff, to corroborate the December 17, 2001 termination date, relies on the former employer's statement in the affidavit that the plaintiff was absent prior to the completion of a project, with a deadline of December 15, 2001, the plaintiff over-reads the import of the December 15, 2001 date. Former Employer Aff. At 124–25. Though the project deadline may have been on December 15, 2001, the former employer does not state that the plaintiff went to Ohio prior to that date. He merely states that the plaintiff, "[b]efore the project was completed, [] flew to her original home in Ohio and was gone for at least three days without notification to the undersigned." *Id.* at 124. Additionally, the plaintiff's bank deposit records show her receipt of five paychecks between November 5, 2001 and January 7, 2002, for payroll periods from October 22, 2001 through December 28, 2001, corroborating the affidavit version that she was not terminated until after she returned from her Ohio trip. Pl.'s 2001 Bank Statements at 2. The plaintiff attempts to explain the discrepancy in being paid for a period after her Ohio trip by styling the last paycheck as a "bonus paycheck," but this characterization of a bonus payment is difficult to reconcile with an employer, whose attitude towards the plaintiff, as she concedes, was to terminate her employment. Furthermore, the plaintiff has submitted no paystubs to support her assertion that the last paycheck was a "bonus" rather than regular compensation, only her own summaries of what her bank records reflect. Even her own summaries, however, contain discrepancies. As part of her response to the Notice of Proposed Termination, she alleged that "the firm paid [her] a $300 bonus on [her] last day of employment there," Pl.'s Resp. to Proposed Termination, dated May 19, 2001, at 8, but that "$300 bonus" is conspicuously omitted from a self-created summary of bank records the plaintiff submitted as an exhibit to her opposition to the defendant's motion for summary judgment, *see* Pl.'s 2001 Bank Statements at 2. Absent evidence to the contrary, the plaintiff's bald assertion that her former employer, who indisputably in his view fired her, nevertheless proceeded to give her a bonus three weeks after she was terminated on December 17, 2001, strains credulity. *See Lash*, 786 F.3d at 6 ("'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quoting *Scott*, 550 U.S. at 380)). Thus, the evidence generally supports the former employer's version set out in his affidavit that the plaintiff was terminated after, not before, her trip to Ohio.

Second, as to the plaintiff's contention that the Agency violated the Privacy Act by opining about "whose account the agency believes to be true," Pl.'s Opp'n at 10 (citing *Doe*, 821 F.2d 694), the Agency counters that it satisfied its obligation to maintain the plaintiff's records "with the accuracy and completeness reasonably required to assure fairness," *Doe*, 821 F.2d at 700, by "includ[ing] both sides of a subjective difference in the individual's file," exactly the agency action endorsed by the D.C. Circuit in *Doe*, Def.'s Opp'n Pl.'s Summ. J. ("Def.'s Opp'n") at 2, ECF No. 76, and, furthermore, the plaintiff is merely using "the Privacy Act to collaterally attack the informed decision of the agency to terminate her employment," *id.* The Court agrees that the plaintiff is confusing erroneous factual matter in personnel records, which may be remedied under the Privacy Act, with considered judgments about factual matters, which are not cognizable claims under this law.

In *Doe v. United States*, cited by the plaintiff, the D.C. Circuit held that the Privacy Act does not require government agencies to definitively conclude, where there are two conflicting stories and the truth may be "'unknownable' by third person," which of the two versions is true and may include both in the record. 821 F.2d at 700–01 ("We do not discern in the Privacy Act any unyielding instruction always to adjudicate in that customary bipolar way so as to find and record 'truth,' rather than to adjust a file equitably to reveal actual uncertainty."). Here, the Agency did exactly that. The plaintiff does not dispute that her record includes both her explanation of her resignation and termination from her former employer, embodied in her E-QIP and her written response to the Notice of Proposed Termination, and her former employer's signed affidavit.

The plaintiff objects to the Agency's *determination* that the plaintiff provided "misleading information" regarding the circumstances of her departure from her former

employer based on the existence of these conflicting versions. *See* Proposed Termination Letter, dated May 10, 2011 at 2; Termination Letter, dated May 26, 2011 at 23. Contrary to the plaintiff's reading of *Doe*, however, the D.C. Circuit does not prohibit an agency from making an adverse agency determination, based on a record that reflect two contradictory stories, by taking one side over the over. *Doe*, 821 F.2d at 696 (the Court does not criticize a second agency's adverse determination that the plaintiff may not obtain security clearance, implicitly discrediting the plaintiff's account). In fact, as the Court has explained *supra* in Part III.B.1, the D.C. Circuit has long held that the Privacy Act cannot be used to "review prohibited personnel practices," *Hubbard*, 809 F.2d at 5, and challenge "the *judgments* of federal officials . . . as those judgments are reflected in records maintained by federal agencies," *Kleiman*, 956 F.2d at 337–38 (emphasis in the original). Therefore, the Court finds that the plaintiff has failed to establish any records that were not maintained "with the degree of accuracy necessary to assure fairness in the determination." *Chambers*, 568 F.3d at 1007

Accordingly, summary judgment is granted to the defendant as to the plaintiff's claims under § 522a(g)(1)(C).

### C. The Plaintiff Cannot Satisfy the Elements of Subsection (g)(1)(D) As a Matter of Law

The plaintiff also fails to state a claim under § 522a(g)(1)(D) that the defendant improperly disclosed the plaintiff's records. To recover under § 522a(g)(1)(D), the plaintiff must demonstrate that "(1) the agency violated a provision of the [Privacy] Act, (2) the violation was intentional or willful, and (3) the violation had an adverse effect on the plaintiff." *Paige v. Drug Enf't Admin.*, 665 F.3d 1355, 1358–59 (D.C. Cir. 2012) (internal quotations omitted). The Court finds that the plaintiff has not demonstrated that the defendant improperly disclosed the plaintiff's records, and, consequently, has failed to meet the first element.

The plaintiff initially alleges that the Agency "had improperly and willfully disclosed and/or disseminated false and defamatory information about Plaintiff to unauthorized employees and other individuals," Consol. Compl. ¶ 62, and that it "improperly and willfully disclosed Plaintiff's social security number and her date of birth because it had failed to redact information from documents," *id.* ¶ 63. After five months of discovery, the plaintiff has pointed to only one instance of disclosure: when the investigator assigned to conduct her background investigation asked one of the plaintiff's own listed verifiers about the plaintiff's "previous employment issues," and may have disclosed such "previous employment issues."[12] Pl.'s Opp'n at 9 (citing Pl.'s Opp'n Ex. BB ("Interview Notes") at 112, ECF No. 89-3, stating "Source was not aware [of] subject's previous employment issues.").

The Privacy Act permits disclosure of an individual's records for a number of reasons, including "for a routine use as defined in subsection (a)(7)," 5 U.S.C. § 522a(b)(3), which term "routine use" is, in turn, defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected," *id*. § 522a(a)(7). The Agency argues, and the Court agrees that disclosing the plaintiff's records to "'third parties during the course of an investigation,'" such as a background investigation for employment with the federal government, "'to the extent necessary to obtain information pertinent to the investigation,'" such as to verify

---

[12] The plaintiff also alleges that the Agency "improperly disclosed Plaintiff's social security number and other private information about her to others," citing to "Doc. 49, page 8," Pl.'s Opp'n at 9, which is simply a reference to the plaintiff's own allegation set out in the Fourth Cause of Action in her Consolidated Complaint. *See* Consol. Compl. ¶¶ 60–63. The Court is mindful that the Agency submitted exhibits to its motion for summary judgment, on March 4, 2014, that revealed the plaintiff's social security number and birthdate, *see* Def.'s Mot. Exs. A & B, ECF No. 63-2, and prompted the plaintiff to file motions to redact that information, *see* Pl.'s Emergency Mots. for Order to Remove Social Security Number, Birthdate, Irrelevant Privacy Act-Protected Information, ECF Nos. 65, 67. The plaintiff's motions were granted insofar as they sought the sealing and redaction of personal information from the defendant's exhibits, as required by the Privacy Act, Federal Rule of Civil Procedure 5.2, and Local Civil Rule 5.4(f). Minute Order, dated, March 24, 2015. These inadvertent disclosures by the defendant were made after the filing of the Consolidated Complaint and, consequently, do not provide the factual basis for the plaintiff's claim. In any event, the Court concluded that the disclosures were inadvertent and not "intentional and willful," *id*., based upon defendant's counsel's explanation that he "was unaware that the areas that appeared redacted on the desktop PC did not persist after filing," Def.'s Not. Of Filing, ECF No. 69.

that the plaintiff is indeed a reliable employee, is a permissible "routine use." Def.'s Mem. at 21–22 (quoting 73 Fed. Reg. 13284, 13319, 13325 (Mar. 12, 2008)). In fact, the plaintiff knew that the information collected during the investigation may be disclosed to her verifiers. The instructions at the beginning of the E-QIP explicitly states that "[t]he information on this form, and information we collect during an investigation may be disclosed without your consent as follows . . . To any source or potential source from which information is requested in the course of an investigation concerning the hiring or retention of an employee or other personnel action." Pl.'s E-QIP at 24. Consequently, if the disclosure alleged by the plaintiff occurred, this disclosure was not improper. Accordingly, the defendant is entitled to summary judgment on the plaintiff's § 522a (g)(1)(D) improper disclosure claim.

## IV. CONCLUSION

For the reasons stated above, the defendant Department of Treasury's Motion for Summary Judgment, ECF No. 63, on the plaintiff's remaining claims alleging violations of the Privacy Act is granted and the plaintiff's Motion for Summary Judgment, ECF No. 64, is denied. The Court also, *sua sponte*, dismisses the plaintiff's Privacy Act claims against the individual defendants.

Since all of the plaintiff's claims have been resolved through dismissal and summary judgment, the Clerk of the United States District Court for the District of Columbia will be directed to close this case.

An Order consistent with this Memorandum Opinion will be contemporaneously issued.

Date: November 24, 2015

Digitally signed by Hon. Beryl A. Howell
DN: cn=Hon. Beryl A. Howell, o=U.S. District Court for the District of Columbia, ou=United States District Court Judge, email=Howell_Chambers@dcd.uscourts.gov, c=US
Date: 2015.11.24 10:50:26 -05'00'

BERYL A. HOWELL
United States District Judge